UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN W. CUMING, as stockholder representative for selling stockholders of Cuming Corporation, and 225 BODWELL CORPORATION,<br><br>    Plaintiffs,<br><br>    v.<br><br>YORK CAPITAL MANAGEMENT, FLOTATION INVESTOR, LLC, and CUMING FLOTATION TECHNOLOGIES, LLC,<br><br>    Defendants. | Civil Action No.<br>12-12339-FDS |

**MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS TO DISMISS**

**SAYLOR, J.**

This is an action arising out of the sale of Cuming Corporation by its stockholders to defendant Cuming Flotation Technologies, LLC ("CFT"). Plaintiff John Cuming has brought suit on behalf of the selling stockholders of Cuming Corporation, asserting claims for breach of contract, conversion, violations of Mass. Gen. Laws ch. 93A, and improper use of confidential information against CFT and two related entities, York Capital Management and Flotation Investor, LLC. Plaintiff 225 Bodwell Corporation asserts a claim for breach of a lease agreement against all three defendants.

The complaint alleges that defendants breached various obligations under a stock purchase agreement, an escrow agreement, and a lease on Cuming Corporation's office space. The complaint further alleges that defendant entities unlawfully converted proceeds obtained

from tax refunds, unlawfully disclosed confidential information to potential purchasers of Cuming Corporation stock, and engaged in unfair or deceptive business practices in conducting all of the activities that form the basis for the other claims.

Defendants have moved to dismiss the action pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted. For the reasons set forth below, the motion will be granted in part and denied in part.

**I.     Background**

The facts are stated as alleged in the complaint.[1]

**A.     The Parties**

Plaintiff John W. Cuming is a former stockholder and the representative of the selling stockholders of Cuming Corporation, a Massachusetts corporation. (Compl. ¶ 1). Cuming Corporation is in the business of designing and manufacturing flotation and insulation equipment for the offshore oil and gas industry. It is located at 225 Bodwell Street, Avon, Massachusetts. (*Id.* at ¶¶ 8, 58). Plaintiff 225 Bodwell Corporation is a Massachusetts corporation that is the owner and lessor of a building located at 225 Bodwell Street in Avon. (*Id.* at ¶ 2).

Deep Down, Inc., which is not a party to this action, provides products and services to the offshore oil and gas industry. Defendant York Capital Management is a general partnership organized under the laws of New York. (*Id.* at ¶ 3). York is the controlling member of defendant Flotation Investor, LLC, which is a limited liability company organized under the laws

---

[1] The Court also draws on exhibits to the complaint and other uncontested documents that are incorporated by reference. *See Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998) ("When . . . a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

of Delaware. (*Id.* at ¶ 3, 16). Defendant Cuming Flotation Technologies, LLC is a Delaware limited liability company that was formed as a joint venture between Flotation Investor, LLC and Deep Down. (*Id.* at ¶ 15).

### B. The Confidentiality Agreement and the Stock Purchase Agreement

In 2009, Deep Down became interested in purchasing Cuming Corporation. On February 25, 2009, to facilitate the negotiation and possible purchase, Deep Down and Cuming Corporation entered into a confidentiality agreement that permitted the disclosure of certain confidential business information concerning Cuming Corporation, subject to various restrictions. (*See* Compl. ¶ 92; Mot. to Dis. Ex. C). The confidentiality agreement, among other things, prohibited Deep Down and its representatives from using confidential or proprietary information disclosed by Cuming Corporation for any purpose other than conducting due diligence in connection with the potential purchase of the company. (Mot. to Dis. Ex. C). It also limited Deep Down's transmission of such information to only those representatives who would "need to know" for the purposes of conducting such diligence. (*Id.*). The confidentiality agreement terminated on August 25, 2010, eighteen months after it came into force. (*Id.*).

The negotiations were successful, and on May 3, 2010, Deep Down entered into a stock purchase agreement ("SPA") with Cuming Corporation and its stockholders, under which Deep Down agreed to purchase the stock of Cuming. (Compl. ¶ 10).

Under the SPA, Cuming Corporation and the selling stockholders made certain representations and warranties, including: (1) that Cuming Corporation had not done anything that would give rise to a material product liability claim; (2) that all tax returns filed by Cuming Corporation were "true, complete and correct in all respects"; (3) that Cuming Corporation's

employee-benefit plans were maintained in accordance with applicable state and federal laws; and (4) that no representation or warranty contained an untrue statement or omitted a material fact. (Mot. to Dis. Ex. B at §§ 4.25, 4.10(a)(I), 4.15(c), 4.30). The agreement provided that these representations and warranties would survive the closing date for a period of eighteen months. (*Id.* at § 8.1).

The selling stockholders also agreed to indemnify the purchaser from any liability incurred as a result of a failure of any of these representations and warranties, provided that written notice of a claim for that liability was submitted before the representations and warranties expired. (*Id.* at § 8.2). The agreement further provided that the selling stockholders were not liable for indemnity obligations unless the aggregate of the losses underlying those obligations exceeded $500,000, in which case the selling stockholders would only be liable for losses in excess of $500,000. (*Id.* at § 8.4). Finally, the SPA provided that CFT was required to pay John Cuming "the amount of any refund of Taxes for any period ending on or before the Closing Date." (*Id.* at § 8.5(b)(iv)).

The Stock Purchase Agreement was amended five times, with the fifth amendment occurring on December 31, 2010. (Compl. ¶ 11). The final purchase price for all of the outstanding shares of Cuming Corporation was $42 million, subject to certain adjustments. (*Id.*).

**C.     The Financing of the Purchase and the Closing**

After signing the SPA, Deep Down contacted York Financial concerning financing for the transaction. (Compl. ¶ 12). York was provided with financial and other confidential information of Cuming Corporation. York had access to Cuming Corporation's financial and other confidential information for several months while Deep Down attempted, but failed, to

finance its purchase of the Cuming Corporation stock. (*Id.* at ¶¶ 13-14). Eventually, Deep Down entered into a joint venture with defendant Flotation Investor (an entity owned by York) to form defendant CFT. On December 31, 2010, Deep Down assigned all of its rights and obligations under the SPA to CFT. (*Id.* at ¶ 15). That same day, the sale of Cuming Corporation stock to CFT closed. (*Id.* at ¶ 66).

      D.      <u>**The Escrow Agreement**</u>

In connection with the closing, CFT, John Cuming, and Rockland Trust Company entered into an escrow agreement, pursuant to which $2 million of the purchase price was deposited by CFT with Rockland Trust, the escrow agent. (*See* Compl. ¶¶ 26-27). Under the terms of the SPA, any indemnification obligation of the selling stockholders was first payable from these escrow funds. (*See* Mot. to Dis. Ex. B at § 8.6).

The escrow agreement provided that if "at any time and from time to time prior to the final distribution of all of the Escrow Fund held in the Indemnity Escrow Account . . . Purchaser may give notice . . . to the Stockholder Representative and the Escrow Agent specifying the nature and dollar amount (to the extent the amount of such claim is known and quantifiable as of such date) of a claim for indemnification. . . ." The escrow agent was not to disburse any of the escrowed funds to the extent such funds were insufficient to cover the claimed indemnity. (*See* Mot. to Dis. Ex. E at § 6(b)). The escrow agreement required the party seeking indemnification to deliver to the escrow agent written proof of delivery to the selling stockholders of a copy of an indemnification claim notice. (*Id.*). The escrow agreement set the date for final distribution of the escrow fund as the first business day at least eighteen months from the closing date (in this case, July 2, 2012). (*See id.*).

### E.     The 225 Bodwell Lease

As a condition of the sale of the Cuming Corporation stock, Cuming Corporation and plaintiff 225 Bodwell Corporation entered into a lease for 76,200 square feet of space at 225 Bodwell Street in Avon. (*See* Compl. at ¶ 58). The lease prohibited "structural alterations to the leased premises." (*Id.* at ¶ 60). The complaint alleges that, notwithstanding that prohibition, CFT subsequently made structural alterations to the leased premises. (*Id.* at ¶ 61).

### F.     Sale of Cuming Stock to Ameriforge

Defendants operated Cuming Corporation from January 1, 2011 until October 7, 2011. (Compl. ¶ 17). On October 7, 2011, CFT sold its Cuming Corporation stock to Ameriforge Group, Inc. (*Id.* at ¶ 18). CFT entered a separate agreement with Ameriforge and did not expressly transfer all of its rights and obligations under the original SPA. According to the complaint, defendants sold Cuming Corporation to Ameriforge for $60 million, a gain of $18 million for its ten months of ownership. (*Id.* at ¶ 19). As of October 8, 2011, Ameriforge has owned and operated Cuming Corporation. (*Id.* at ¶ 20).

### G.     Indemnification Claims

On June 29, 2012, Glen Gordon, CFT's President (and also a Senior Vice President of York), sent an e-mail to John Cuming with an updated schedule of CFT's indemnification claims as of that date, which totaled $861,083.67. (Compl. ¶¶ 32-34; Mot. to Dis. Ex. F). He also attached to the e-mail a separate spreadsheet concerning a warranty claim based on an alleged defect in certain products (ODN1 and ODN2 Riser Buoyancy Modules) that Cuming Corporation had designed and manufactured in 2010 and sold in 2011. (*See* Compl. ¶ 43; Mot. to Dis. Ex. F). Later that day, Gordon also sent a fax to Barbara Whitman at Rockland Trust

Company stating that CFT had "provided John Cuming with claims against our indemnity held in escrow" and asking her to call him the following Monday to discuss them. (Compl. ¶ 37).

On June 30, 2012, Mark Schlegel of Cuming Corporation sent an e-mail to John Cuming providing further details concerning the basis for the ODN warranty claim. He wrote that CFT had identified approximately "$500k in active and potential warranty claims related to DSME drill ships ODN1 and ODN2" that were based on Cuming Corporation's actions in 2010. He also stated that "since the warranty period and the ability for DSME to file warranty claims are still open on ODN1 & ODN2 the claim will need to remain open until the warranty period for the rigs is completed [May 2013]." (Mot. to Dis. Ex. H). That email was forwarded to John Cuming on July 1. (*Id.*).

On August 14, 2012, Gordon sent another e-mail to John Cuming about the ODN warranty claim. The e-mail stated as follows:

> [t]he potential liability to Purchaser from this exposure is as large as $3.5 million or 10% of order size. The product warranty in question runs through mid-2013; until such time, it is unlikely Purchaser will know with some certainty the total amount of claims for indemnification. With respect to this particular matter, the purpose of our e-mail of June 29, 2012 and the e-mail by Mark Schlegel on June 30, 2012 was to notify the Selling Stockholders of such matter to the extent of the information then available. As Purchaser learns more about this matter, additional information will be provided. Given the unquantifiable and unresolved status of these claims, we are not comfortable releasing any of the escrow.

(Mot. to Dis. Ex. I).

The parties corresponded briefly after the August 2012 e-mail but were unable to reach agreement as to whether the escrow funds should be released. Plaintiffs then initiated this litigation.

## II.   Standard of Review

On a motion to dismiss, the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the plaintiff must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the complaint's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

## III.   Analysis

### A.   Doctrine of Corporate Disregard

Defendants York and Flotation first contend that all claims against them should be dismissed because they are not parties to the SPA, the Escrow Agreement, or the lease.

It does not appear to be disputed that York and Flotation are not parties to any of the three contracts. Plaintiffs nonetheless contend that the various corporate structures should be disregarded, and all defendants should be treated as a single entity.

In Massachusetts, there is a presumption of corporate separateness, meaning separate

corporations are to be treated as separate entities absent an affirmative showing of compelling circumstances.  *See Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 128 (1st Cir. 2006).  This presumption may be overcome by the operation of the doctrine of corporate disregard, which applies only when there is a compelling reason of equity "to look beyond the corporate form for the purpose of defeating fraud or wrong, or for the remedying of injuries."  *Gurry v. Cumberland Farms, Inc.*, 406 Mass. 615, 625-626 (1990) (quoting *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 618 (1968)) (internal quotations omitted).

In determining whether circumstances warrant the operation of the doctrine of corporate disregard, the court must evaluate the evidence as to the existence of some or all of the so-called "*Pepsi-Cola* factors."  Those factors include:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) non-functioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

*Platten*, 437 F.3d at 128 (citing *Attorney Gen. v. M.C.K., Inc.*, 432 Mass. 546 (2000); *Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 14-16 (1st Cir. 1985)).

Defendants contend, among other things, that under Massachusetts law the doctrine of corporate separateness cannot be overcome in breach-of-contract actions, citing *Birbara v. Locke*, 99 F.3d 1233, 1238 (1st Cir. 1996).  But the problem with plaintiffs' argument is even more fundamental.  The complaint makes no allegations whatsoever about the doctrine of corporate disregard, or piercing the corporate veil, or any related theory of liability.  And it makes no allegations of any kind concerning the intermingling of assets, nonobservance of

9

corporate formalities, or any of the other *Pepsi-Cola* factors.[2] Instead, it simply alleges a breach of the Escrow Agreement by all defendants (Count 1), a breach of the SPA by all defendants (Count 2), and a breach of the lease by all defendants (Count 4). York and Flotation are not parties to those agreements. The complaint therefore fails to state a claim against either York and Flotation for breach of contract. Accordingly, the defendants' motion to dismiss will be granted as to the breach of contract claims against defendants York and Flotation, but denied as to defendant CFT.

B.      **Breach of Lease**

Count 4 of the complaint asserts a claim for breach of the lease on 225 Bodwell Street. Defendants contend that this claim should be dismissed because the lease is between 225 Bodwell Corporation and Cuming Corporation. The complaint indeed alleges that the lease was entered into on December 31, 2010, by Cuming Corporation as a condition of the sale of the Cuming Corporation's stock to defendants. The allegations of the complaint suggest that plaintiff John Cuming owned the property at which Cuming Corporation conducted its business and set up 225 Bodwell Corporation to lease it back to the Cuming Corporation after selling his ownership stake in the company. The lease itself reflects this understanding, naming only 225 Bodwell Corporation and Cuming Corporation as parties to it. (*See* Opp. at Ex. 3).

Plaintiffs, however, contend that defendants assumed the rights and obligations of Cuming Corporation, including those under the lease, when they entered into the SPA. Plaintiffs do not point to any provision of the SPA, or an independent assignment, that operates to assign

---

[2] The closest the complaint comes to make such an allegation is in paragraphs 15 and 16: "[CFT] is an entity owned and controlled by defendants Flotation Investor LLC . . . and York. At all relevant times, CFT and [Flotation Investor LLC] were owned and controlled by defendant York." An allegation of mere ownership and control of a subsidiary entity is far from sufficient to invoke the doctrine of corporate disregard.

the lease from Cuming Corporation to CFT. The Court has examined the documents in the record and can find no such provision in any of them. Furthermore, there are no allegations in the complaint that would support disregarding the corporate separateness of Cuming Corporation and the corporation that purchased its stock, CFT. *See Platten*, 437 F.3d at 128. Therefore, the proper defendant for a breach of lease action is Cuming Corporation, not any of the named defendants.

Accordingly, defendants' motion to dismiss will be granted as to the breach of lease claim against all defendants.

### C.     Breach of SPA and Escrow Agreement

The central claim of the complaint is a breach-of-contract claim as to the provisions of the SPA and the escrow agreement related to indemnification claims. Specifically, plaintiffs contend that defendants did not properly provide timely notice of indemnity claims sufficient to exhaust the escrow account, and, therefore, the escrow funds should have been disbursed to plaintiff Cuming as provided in the escrow agreement. Defendants contend that failure to send an indemnity notice that conforms with § 10.6 of the SPA and § 13 of the escrow agreement (which require notice by fax, in-hand delivery, or overnight mail) would not, as a matter of law, invalidate that notice or waive the right to indemnification, because the notice requirements constitute covenants, not conditions precedent. Defendants further contend that the Court lacks subject-matter jurisdiction over the claims because they are not ripe.

It is true that the notice requirements at issue operate as covenants rather than conditions precedent; failure to comply with them would not destroy the underlying right to indemnification. That reading of the provisions at issue not only conforms with the majority of

case law on the subject, but also the language of the agreements themselves.  *See University Emergency Med. Found. v. Rapier Invs., Ltd.*, 197 F.3d 18, 22-23 (1st Cir. 1999) (provision that notice be sent in a particular manner to a particular address does not "allow one party to extinguish the other's contractual rights based on a failure of strict compliance", especially where overall structure of contract indicates parties did not intend strict compliance to be a condition of performance); *Hohenberg Brothers Co. v. George E. Gibbons & Co.*, 537  S.W.2d 1, 3 (Tex. 1976) (unless contract uses terms such as "if", "provided that", "on condition that", or some phrase that makes performance specifically conditional, obligation will be construed as a covenant, not a condition, in order to prevent a forfeiture); *Thomas v. Massachusetts Bay Transp. Auth.*, 39 Mass. App. Ct. 537, 543 (1995) ("[g]enerally, quite emphatic words are necessary to create a condition precedent to the maturing of rights under a contract, or the forfeiture of rights.").  The SPA specifically provides that failure to notify the indemnifying party of the claim shall not result in a forfeiture of the right to indemnification; unless the indemnifying party can "demonstrate actual loss and prejudice as a result of such failure."  (*See* SPA § 8.3 (a) and (b)).  Furthermore, § 10.4 of the SPA provides that "[n]o failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy."  Accordingly, the Court will not interpret the alleged failure of defendants to properly notify plaintiff Cuming of indemnity claims to operate as a waiver of those claims.

       Defendants' contention, however, that the claims are not yet ripe is incorrect.  The issue at the heart of the complaint is the timely disbursement of escrow funds, not whether defendants

are actually entitled to indemnity. The breach-of-contract claim is, in part, based on the allegation that the escrow funds were not timely disbursed as required by the escrow agreement. That claim has been ripe as of the date set forth in the escrow agreement as the deadline for submitting indemnity claims—July 1, 2012. Compliance with the notice requirements is only tangentially relevant to that issue, bearing only on whether the actual notice given was detailed enough to indicate that the indemnity claims would likely exceed the escrow funds.

The facts set forth in the complaint suggest that there was no indication, prior to the date set forth in the escrow agreement, that the indemnity claims would total more than $2 million. It was not until the e-mail of August 14, 2012, from Gordon that plaintiff Cuming had any indication that the indemnity obligation for warranty claims was potentially as large as $3.5 million. The notices prior to July 1, 2012, which is the deadline set forth in the escrow agreement, disclosed total indemnity amounts well below the $2 million balance of the escrow—Gordon's June 29 e-mail indicating a total of $861,083.67 and Schlegel's June 30 e-mail disclosing ODN warranty claims potentially amounting to another $500,000. Therefore, the evidence taken in the light most favorable to the plaintiffs indicates that at least some of escrow funds should have been disbursed to plaintiff Cuming as set forth in the agreement. Accordingly, defendants' motion to dismiss the breach-of-contract claims will be denied as to defendant CFT.

### D.     Disclosure of Confidential Information

The complaint alleges that defendants disclosed confidential information to Ameriforge prior to the closing on the sale of Cuming Corporation stock to defendants in violation of the confidentiality agreement and common-law duties of confidentiality. Defendants York and

Flotation contend that they were not parties to the confidentiality agreement and consequently cannot be subject to suit for violations of it.

The contract in question was between Deep Down and Cuming. Deep Down is not a party to this lawsuit. Any claim against York or Flotation for breach of contract based on a violation of the confidentiality agreement must therefore fail.

Nonetheless, the common law of Massachusetts does recognize a duty of confidentiality that can go beyond the scope of express confidentiality agreements in certain circumstances. *See Diomed, Inc. v. Vascular Solutions, Inc.*, 417 F. Supp. 2d 137, 145 (D. Mass. 2006) (stating that under Massachusetts law "even with a written [confidentiality agreement] in place, the Court may examine the conduct of the parties to determine the scope of their confidential relationship and the reasonableness of their efforts to protect secrecy") (internal quotations omitted).

Defendants contend that even if an obligation of confidentiality existed, the claim should be dismissed because the complaint fails to establish any plausible entitlement to relief. The complaint includes the allegation that "York's plan was to use its knowledge of Cuming Corporation's sensitive financial and confidential information, and market Cuming Corporation to other potential buyers between May 2010 and December 31, 2010." (Compl. ¶ 65). Defendants contend, however, that because the complaint does not go on to articulate how this alleged act could have caused them injury, it fails to state a claim. Defendants base this contention on the fact that as of May 2010 plaintiffs had already entered into a binding agreement to sell Cuming Corporation for $42 million. Therefore, according to defendants, it is irrelevant whether defendants subsequently used confidential financial information to market Cuming Corporation for sale prior to the December 31, 2010 closing. Because plaintiff

relinquished their right to sell Cuming Corporation to another buyer when any alleged misuse of confidential information took place, he could not have suffered cognizable injuries as a result.

Plaintiffs respond that the cognizable injury arose when, while misusing the confidential information to shop Cuming Corporation, defendant York delayed the closing of the sale of stock pursuant to the SPA. Plaintiff Cuming contends that he was denied the benefit of the sale proceeds, as well as the opportunity to pursue more lucrative offers.

However, it was not the alleged misuse of confidential information that denied him those benefits; it was his agreement to the terms of the SPA. The terms of the SPA allowed defendants to delay the closing and also established the purchase price. After signing the SPA, the selling stockholders no longer had the right to seek alternative offers or to demand a rapid closing without modifying the terms of the SPA. The fact that defendants may have later benefitted from the confidential information they obtained during the negotiating process does not necessarily mean that plaintiff experienced a corresponding harm. Therefore, the complaint alleges no cognizable injury.

Accordingly, defendants' motion to dismiss will be granted as to the claim of breach of the confidentiality agreement and breach of the common law duty of confidentiality against all defendants.

### E. Conversion

The complaint asserts a claim against all defendants for conversion of $200,963 in Massachusetts state tax refunds allegedly due to the selling stockholders. Under Massachusetts law, a defendant may be liable for the tort of conversion if he "intentionally or wrongfully exercised acts of ownership, control, or dominion over personal property to which he has no

right of possession at the time" *In re Brauer*, 452 Mass. 56, 67 (2008) (citations omitted).

Defendants have moved to dismiss this claim on the ground that the complaint never alleges that defendants received the tax refunds, but rather simply alleges that the Massachusetts Department of Revenue refunded to Cuming Corporation some of its tax liabilities for 2007 and 2008. Furthermore, the complaint alleges that defendants no longer own or control Cuming Corporation. Therefore, defendants argue, plaintiff has not alleged that defendants exercised "ownership, control, or dominion" over the tax refunds. *In re Brauer*, 452 Mass. at 67.

However, unlike the breach-of-lease claim discussed above, defendants may in fact be proper parties in a suit for conversion despite the fact that Cuming Corporation was the nominal recipient of the refunds. Conversion can be proved by showing that a defendant exercised "dominion or control" over the property at issue. The complaint alleges that defendants exercised complete control over Cuming Corporation until they resold it to Ameriforge. Therefore, assuming, as the complaint does, that the alleged conversion took place during that intervening time, plaintiffs have adequately pleaded a conversion claim against defendants. Accordingly, defendants' motion to dismiss will be denied as to the claim for conversion.

### F.     Chapter 93A Claim

It is well-established that for a chapter 93A claim the conduct in question fall within "'the penumbra of some common-law, statutory, or other established concept of unfairness' or [be] 'immoral, unethical, oppressive or unscrupulous.'" *Id.* (quoting *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 769 (1st Cir. 1996). "A mere breach of contract does not constitute an unfair or deceptive trade practice under 93A, unless it rises to the level of 'commercial extortion' or a similar degree of culpable conduct." *Id.* (citing *Ahern v. Scholz*, 85 F.3d 774, 798 (1st Cir.

1996), and *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 583 N.E.2d 806, 821 (Mass. 1991)).

Defendants contend that because the allegations of the complaint do not adequately plead any underlying breach of contract or tort claims, the chapter 93A claims must fail as well. However, the complaint includes allegations of tortious and intentional conduct on the part of defendants during the course of their transactions with plaintiffs. Among other things, it includes allegations that defendants intentionally withheld tax refunds that they knew were owed to plaintiff, and that defendants refused in bad faith to disburse escrow funds. Under the circumstances, defendants' motion to dismiss will be denied as to the plaintiffs' chapter 93A claims.

## IV.     Conclusion

For the foregoing reasons, defendants' motion to dismiss is GRANTED as to claims of breach of lease, breach of the confidentiality agreement, and breach of the common law duty of confidentiality against all defendants; GRANTED as to the breach of contract claims against defendants York Capital Management and Flotation Investor, LLC; and DENIED as to the remaining claims.

**So Ordered.**

                                                    /s/ F. Dennis Saylor
                                                    F. Dennis Saylor IV
                                                    United States District Judge

Dated: August 13, 2013